1    **BRIDGET L. KENNEDY**
California State Bar No. 253416
2    **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3    San Diego, CA 92101-5030
(619) 234-8467/Fax: (619) 687-2666
4    E-Mail: bridget_kennedy@fd.org

5    Attorneys for Mr. Bragg

6

7

8            UNITED STATES DISTRICT COURT

9          SOUTHERN DISTRICT OF CALIFORNIA

10       **(HONORABLE CATHY ANN BENCIVENGO)**

| | | |
|---|---|---|
| 11   UNITED STATES OF AMERICA, | ) | Case No. 12CR3617-CAB |
| 12          Plaintiff, | ) ) | |
| 13   v. | ) ) ) | STATEMENT OF FACTS AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF |
| 14   **ISAAC SYMEON BRAGG**, | ) ) | DEFENDANT'S MOTIONS |
| 15         Defendant. | ) ) | |
| 16   ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

                                   **I.**

17             **STATEMENT OF FACTS**[1]

18       The government has charged Mr. Bragg in a two count indictment with

19 Sex Trafficking of a Minor, and Sexual Exploitation of a Minor, in violation of 18

20 U.S.C. §§ 1591, 2251.  Mr. Bragg has entered a not guilty plea to the indictment.  In

21 essence, the government alleges that in 2010, Mr. Bragg posted explicit photographs

22 of a 17-year old girl on BackPage.com, for prostitution.

23 **A)**       **2010 Investigation, Arrest, and Search**

24       San Diego Detective James C. Hunter began an investigation against

25

26 ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

27       [1] Unless otherwise stated, the "facts" referenced in these papers come from

28 government-produced discovery that the defense continues to investigate. Mr. Bragg does not admit the accuracy of this information and reserves the right to challenge it at any time.

1  Mr. Bragg on April 26, 2010.  According to his report, he began the investigation

2  because:

> On April 26, 2010 I received information that 30 y/o BRAGG was in
> possession of 17 y/o Dezaree and her five month old baby, Jordan.
> Considering BRAGG was on parole and had multiple priors for pimping I
> initiated an investigation.

5  Detective Hunter met with Dezaree's mother who believed that Dezaree was working

6  as a prostitute and had found pictures of Dezaree posted on Backpage.com.  The

7  photos were posted under the name "Sara," and Dezaree's cell phone number was

8  listed.  Dezaree's bank account showed 13 debits to Backpage.com.  Dezaree's mother

9  claimed that she had been a runaway and was with Mr. Bragg on the dates that the

10  debits were made to Backpage.com, and that she had seen Dezaree with Mr. Bragg.

11  Detectives surveilled Mr. Bragg, and on May 6, 2010, allegedly saw him

12  intimately kissing Dezaree, the 17 year old girl.  He was arrested for two violations

13  of parole: driving a motor vehicle; and for associating with a person known to be a

14  prostitute.  According to the report, he was arrested at about 7:55 pm.

15  Agent Hunter did a Cellbrite forensics download of a cell phone, alleged

16  to be Mr. Bragg's phone, on May 6, 2010, at about 11:30 pm.  There is no evidence

17  of a warrant being issued for this forensics download of the phone.  The Cellbrite

18  analysis downloaded the contacts and photographs from the phone.  It did not

19  successfully download the text messages that were stored on the phone.  Agent

20  Hunter reviewed and transcribed each of the text messages on the phone after the

21  Cellbrite download.

22  **B)**      **July 9, 2011 Alleged Statements**

23  Two San Diego detectives, Det. Michael Rand and Det. Moore

24  interviewed Mr. Bragg while he was in San Diego Central jail on July 9, 2011, while

25  investigating a different case against a woman believed to have stabbed a man two

26  days before.  Mr. Bragg has not been provided with a recording of this interview, but

27  there is a summary by Det. Rand in his report of investigation.  The summary of the

28  interview is as follows:

1   On 07-09-11, Det. Moore and I went to San Diego Central Jail in order
2   to interview Bragg to see if he knew anything about the girl in the photo.
    I explained to Bragg that based on the information provided by Det.
3   Hunter it showed that he had placed the ad for the female suspect.
    Bragg denied having anything to do with placing the ad and said he did
4   not know who the girl was.  Bragg told me that his e-mail address;
    blackmagicmoney70@yahoo.com, is commonly used by several other
5   people and that any one of those people could have placed the ad.  He
    also said that everyone knows where he lives and could have put his
6   address in where required for the ad.  Ultimately, Bragg admitted to
    providing friends of his with his access information for backpage.com
7   but refused to identify any of those people.

The government has not provided any further information about this interview,

including whether Mr. Bragg was given <u>Miranda</u> warnings before being questioned,

whether he was given an opportunity to contact his lawyer before being questioned,

or whether the detective contacted his lawyer before questioning him.

**C)**      <u>**August 1, 2012 Statements**</u>

Agents Tim Read and John Donaher interrogated Mr. Bragg on August

1, 2012, when Mr. Bragg reported to his state parole officer.   Transcript of

interrogation attached as Exhibit A.  He was interrogated in a room at the parole

office, in the middle of his parole meeting.

Agents Read and Donaher invented a story as a pretense for questioning

Mr. Bragg. They told Mr. Bragg that they received a call that morning of a kidnaping

in Mexico, and that they needed his help to find the woman who had been kidnaped

and find out if the report was a hoax.  There was no report of a kidnaping.  The agents

kept up this cover story throughout the entire interrogation and never told Mr. Bragg

that it was a cover story for interrogating him.

Although Mr. Bragg had been charged with a serious crime and was

actually being interrogated in investigation of that crime, the agents did not tell Mr.

Bragg that he was charged with a crime until the very end of the interrogation, when

they claimed to have suddenly found a warrant for him, and claimed not to know what

the warrant was for.  Ex. A, 23-29.  Throughout the entire interrogation, the agents

told Mr. Bragg that he was not under arrest, and that they were only questioning him

to get help with the kidnaping report.  When Agent Read introduced himself, he told

Mr. Bragg that "we're not trying to spook or scare you or anything crazy like that, but we had something come up and we think you might be able to help us out." Ex. A, 1. Then, while explaining the supposed kidnaping report, Agent Read told Mr. Bragg "we don't think you have anything to do with any of this stuff, we just want to know what you know about this particular gal so we can try to help her family out help try to figure out where she's at." Ex. A, 2. They continued, throughout the entire interrogation, telling Mr. Bragg that they were only asking him questions to find the girl, and that they did not think he had anything to do with the situation.

Although the agents knew that Mr. Bragg would be going straight from their interrogation to federal jail, they repeatedly told Mr. Bragg that he would be going home after he answered their questions. At the very beginning of the interrogation, Agent Read told Mr. Bragg that they were there for a "couple of things," and that he could "go test afterwards" -- referring the urinalysis drug test that Mr. Bragg had to take as part of his meeting with his parole officer. Ex. A, 1. Before reading Mr. Bragg his Miranda rights, Agent Read told him that they "just want to ask you a couple of quick questions and get out of here so that you can go on and do whatever you normally do here and get out of the way here." Ex. A, 1. The agents never told Mr. Bragg that he was under arrest and going to jail until the very end of the interrogation -- throughout the interrogation they repeatedly said and implied that he would be released after he answered their questions.

Although Agent Donaher read Mr. Bragg his Miranda rights, the agents did as much as possible to undercut and trivialize those rights. They told Mr. Bragg that they were reading him his rights because his "probation" officer told they them had to. Ex. A, 2. Agent Read told Mr. Bragg that the "probation guy said we gotta read your rights," and that "it doesn't make any difference, I'm sure you have had that read to you a whole bunch of times before." Ex. A, 2. Then, just before Agent Donaher began reading the rights, Agent Read told Mr. Bragg that the Miranda rights are "just their policy stuff." Ex. A, 3. After reading Mr. Bragg the rights, Agent

12CR3617-CAB

Donaher asked Mr. Bragg "so do you waive those rights? Just talk to us? I mean if you have nothing to do with this than that's cool." Ex. A, 3. Mr. Bragg told the agents that he had nothing to do with the kidnaping. Ex. A, 3. Though Mr. Bragg did not explicitly waive his rights, he began answering the questions posed by the agents pursuant to this supposed kidnaping investigation -- while the agents assured him the questioning had nothing to do with him, and they were just trying to investigate this kidnaping report.

Once the agents told Mr. Bragg that there was a warrant for his arrest, he asked repeatedly what the warrant was for and why he was being arrested. The agents told Mr. Bragg the statute number under which he was charged but refused to tell him what the statute was for. Ex. A, 23-27. At that time, Mr. Bragg asked for an attorney. Ex. A, 26.

## II.
## MOTION TO SUPPRESS STATEMENTS

Mr. Bragg moves to suppress the two sets of statements that the government has provided discovery on: statements he allegedly made on July 9, 2011 to San Diego Detectives Moore and Rand; and statements he made on August 1, 2012 to Agents Read and Donaher. He moves to suppress these statements under both voluntariness and <u>Miranda</u> grounds.

**A)**   **<u>The Government Must Prove That Mr. Bragg Was Given Adequate <i>Miranda</i> Warnings Before Any Custodial Interrogation And That He Made A Voluntary, Knowing, And Intelligent Waiver Of Those Rights.</u>**

The Supreme Court has held that the government may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. <u>See Miranda-Arizona</u>, 384 U.S. 436, 444 (1966). Custodial interrogation is questioning by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. <u>Id</u>. at 477. In <u>Stansbury v. California</u>, the Supreme Court clarified its prior decisions by stating that "the initial determination of custody

depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." 511 U.S. 318, 323 (1994). The Ninth Circuit has held that a suspect will be found to be in custody if the actions of the interrogating officers and the surrounding circumstances constrained the suspect's freedom of movement in such a way that a reasonable person in that situation would not have felt free to leave. See United States v. Basher, 629 F.3d 1161, 1166 (9th Cir. 2011).

Once a person is in custody, Miranda warnings must be given prior to any interrogation. An interrogation is not necessarily direct questioning by law enforcement. Rather, an interrogation happens when law enforcement knows or should know that their statements or actions are reasonably likely to elicit an incriminating response from the suspect. See Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Miranda warnings must advise the defendant of each of his or her "critical" rights. See United States v. Bland, 908 F.2d 471, 473 (9th Cir. 1990). The warnings must clearly convey these critical rights and the agents may not undercut or contradict the purpose behind Miranda. See Doody v. Ryan, 649 F.3d 986 (9th Cir. 2011) (en banc). Furthermore, if a defendant indicates that he wishes to remain silent or requests counsel, the interrogation must cease immediately. See Miranda, 384 U.S. at 473-74; see also Edwards v. Arizona, 451 U.S. 477, 482 (1981).

For a defendant's statements to be admitted into evidence, the defendant's "waiver of Miranda rights [during custodial interrogation] must be voluntary, knowing and intelligent." United States v. Binder, 769 F. 2d 595, 599 (9th Cir. 1985) (citing Miranda, 384 U.S. at 479), overruled on other grounds by United States v. Morales, 108 F.3d 1031 (9th Cir. 1997) (en banc); see also United States v. Vallejo, 237 F.3d 1008, 1014 (9th Cir. 2001); Schneckloth v. Bustamonte, 412 U.S. 218 (1973). When interrogation continues in the absence of an attorney, and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant intelligently and voluntarily waived his privilege against self-incrimination and his

12CR3617-CAB

1  right to counsel.  See Miranda, 384 U.S. at 475.  In fact, the Ninth Circuit has held

2  that "[t]here is a presumption against waiver." United States v. Garibay, 143 F.3d

3  534, 536-37 (9th Cir. 1998) (citing United States v. Bernard S., 795 F.2d 749, 752

4  (9th Cir. 1986)) (other internal citations omitted); see also United States v. Heldt, 645

5  F.2d 1275, 1277 (9th Cir. 1984) (stating that the court must indulge ever reasonable

6  presumption against waiver of fundamental constitutional rights) (citing Johnson v.

7  Zerbst, 304 U.S. 458, 464 (1938)).

8       The  validity  of  the  waiver  depends  upon  the  particular  facts  and

9  circumstances surrounding the case, including the background, age, experience, and

10  conduct of the accused.  See Edwards, 451 U.S. at 482.  A determination of the

11  voluntary nature of a waiver "is equivalent to the voluntariness inquiry [under] the

12  [Fifth] Amendment." Derrick v. Peterson, 924 F.2d 813, 820 (9th Cir. 1990).

13       A determination of whether a waiver is knowing and intelligent, on the

14  other hand, requires a reviewing court to discern whether "the waiver [was] made

15  with a full awareness both of the nature of the right being abandoned and the

16  consequences of the decision to abandon it." Id.; see also United States v. Amano,

17  229 F.3d 801, 805 (9th Cir. 2000); Garibay, 143 F.3d at 536.  This inquiry requires

18  that a court determine whether "the requisite level of comprehension" existed before

19  upholding the purported waiver.  Derrick, 924 F.2d at 820.  Thus, "[o]nly if the

20  'totality of the circumstances surrounding the interrogation' reveal *both* an uncoerced

21  choice *and* the requisite level of comprehension may a court properly conclude that

22  the Miranda rights have been waived." Id. (citations omitted).

23  1)      The July 9, 2011 Statements Violated Miranda, Because There is No
        Evidence That Mr. Bragg Was Given His *Miranda* Warnings Or Waived
24      His Rights.

25       Mr. Bragg was clearly in custody when he was questioned on July 9,

26  2011, by San Diego Detectives Rand and Moore -- he was in San Diego Central Jail.

27  Although we do not know the exact questions that were asked, there was clearly

28  interrogation -- the detectives interviewed Mr. Bragg "to see if he knew anything

about the girl in the photo."  The government has provided no evidence that any Miranda warnings were given to Mr. Bragg, and thus they have not met their burden under Miranda.  There is likewise no evidence that Mr. Bragg waived his rights under Miranda, so those statements may not be used against him in trial.

2)　　　The August 1, 2012 Statements Violated Miranda, Because The Agents Undercut And Contradicted The *Miranda* Warnings.

"The Miranda warning is intended to ensure that all persons taken into custody are first made aware of their rights before being interrogated by the Government. *It is imperative that this procedure is taken seriously*."  United States v. San Juan-Cruz, 314 F.3d 384, 389 (9th Cir. 2002) (emphasis added).  Agents here did not take the Miranda warning procedure seriously.  Just before Agent Donaher read Mr. Bragg his Miranda rights, Agent Read told Mr. Bragg that the Miranda warnings are "just their policy stuff."  Agent Donaher told Mr. Bragg that they had to read him his rights because the "probation officer" said they had to.  Agent Donaher told Mr. Bragg that the "probation guy said we gotta read your rights and stuff before we talk if that's cool with you. *It doesn't make any difference*, I'm sure you have had that read to you a whole bunch of times before."

Where law enforcement downplays the significance of the Miranda rights like they did here, the Miranda warning is not sufficient.  In Doody, the Ninth Circuit reviewed the state appellate court's decision under the strict AEDPA standard, and found that the Miranda warnings given in that case were so insufficient that the state court's decision upholding the introduction of the statements was clearly contrary to the law.  Doody, 649 F.3d at 991.  Among the problems with the Miranda warnings as stated by the police officers was that the detective "began by informing [the juvenile defendant] that the warnings were merely a formality that [he] should not take out of context."  Id.

Agents Read and Donaher told Mr. Bragg that the Miranda warnings were just "policy stuff," said that they were only reading the rights because the probation

"guy" said to, and told Mr. Bragg that the <u>Miranda</u> rights don't make any difference. "The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." <u>Miranda</u>, at 476. The agents's comments here reduced Mr. Bragg's <u>Miranda</u> rights to less than a preliminary ritual. No <u>Miranda</u> warnings can be effective in this context, with these comments.

2)      <u>The August 1, 2012 Statements Violated *Miranda* Because Mr. Bragg Could Not Have Made A Knowing, Voluntary, or Intelligent Waiver Of His Rights Because The Agents Questioned Him When He Reported For Parole And Lied To Him About The Purpose Of The Questioning.</u>
Because of the way that the agents questioned Mr. Bragg, the government cannot meet their burden of proving that Mr. Bragg made a knowing, voluntary, and intelligent waiver of his <u>Miranda</u> rights.

First, they interrogated him when he reported to his parole officer, taking advantage of the unique relationship between a parolee and his parole agent. As a parolee, Mr. Bragg was subject to conditions of parole that are not imposed on a person not on parole -- including following all of his parole agent's instructions. Mr. Bragg's failure to follow his parole agent's instructions could lead to a return to prison. The role of a parole agent to his parolee is thus particularly coercive. Agents Read and Donaher exploited this coercive relationship by interrogating Mr. Bragg when he reported to his parole agent. They did not take any curative steps to make clear that he was not required to meet with the agents for his parole. Instead, they took affirmative steps to link their interrogation with his parole meeting -- including interrogating him at the parole officer when he reported, interrogating him before he took his drug test, and repeatedly referring to his drug test and that he would be taking the drug test after the interrogation. Other than the fact that the parole agent was not the one doing the questioning, there were no steps taken to separate this interrogation from his parole meeting. No one explained to Mr. Bragg that even though he was in the middle of a meeting with his parole agent, his rules on parole did not apply to this particular set of questioning. No waiver could be knowing or

1    voluntary in light of this kind of coercion -- where Mr. Bragg was at a parole meeting,

2    and under a condition of parole that he has to follow his parole agent's instructions

3    or be returned to prison.

4         Also, the agents' made-up story about a kidnaping to trick Mr. Bragg into

5    waiving his <u>Miranda</u> rights and answering their questions prevented Mr. Bragg from

6    making a knowing, intelligent, and voluntary waiver of his rights. They did

7    everything they could to make it seem like Mr. Bragg was *not* being charged with a

8    crime, and to make it seem like waiving his <u>Miranda</u> rights was just a formality.

9         The agents continuously said that Mr. Bragg would be released after he

10    answered their questions -- something they knew was a lie. At the very beginning of

11    the interrogation, Agent Read told Mr. Bragg that he was there for a "couple of

12    things," and that he would be able to "go test afterwards" -- referring to the urinalysis

13    drug test that Mr. Bragg had to take as a condition of his parole. Ex. A, 1. He told

14    Mr. Bragg that they just wanted to ask a "couple of quick questions" and then "get

15    you out of here so that you can go on and do whatever you normally do here and get

16    out of the way here." Ex. A, 1. Later in the interrogation Agent Read again told

17    Mr. Bragg that "all we need, we need your help," Ex. A, 8, and continued to tell

18    Mr. Bragg that "this doesn't have anything to do with you." Ex. A, 11.

19         The agents framed all their questions as if there really was a kidnaping

20    report, and they were asking Mr. Bragg questions to investigate the kidnaping.

21    Almost everything they told Mr. Bragg was a lie, clearly designed to trick him into

22    answering questions that they apparently thought he would not answer if not tricked

23    in this way. The government cannot prove that Mr. Bragg made a knowing and

24    intelligent waiver of his <u>Miranda</u> rights where he did not even know that he was being

25    charged with a crime, and the agents said that he was being questioned solely to help

26    them find a missing person.

27    **B)**      <u>**The Government Must Prove That Mr. Bragg's Statements Were**</u>
             <u>**Voluntary.**</u>

28    Even when <u>Miranda</u>'s procedural safeguards have been satisfied, a

       12CR3617-CAB

defendant in a criminal case is deprived of due process of law if his conviction is founded upon an involuntary confession. See Arizona v. Fulminante, 499 U.S. 279 (1991); Jackson v. Denno, 378 U.S. 368, 387 (1964). The government bears the burden of proving -- by a preponderance of the evidence -- that a confession is voluntary. See Lego v. Twomey, 404 U.S. 477, 483-84 (1972). A voluntary statement must be the product of a rational intellect and free will. See Blackburn v. Alabama, 361 U.S. 199, 208 (1960). In determining the voluntariness of a confession, the Ninth Circuit has required consideration of "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." United States v. Bautista-Avila, 6 F.3d 1360, 1364 (9th Cir. 1993) (citations omitted); see also Schneckloth-v. Bustamonte, 412 U.S. 218, 226 (1973). In general, a statement is considered involuntary if it is "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." Hutto v. Ross, 429 U.S. 28, 30 (1976) (per curium) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897).

1.      The August 1, 2012 Statements Were Not Voluntary Because the Agents Exerted Improper Influence by Lying to Mr. Bragg About the Purpose of the Interrogation and by Interrogating Him When He Reported to His Parole Officer.

The government cannot meet its burden of showing that any statements made on August 1, 2012 were voluntary for the same reasons that it cannot meet its burden of showing that Mr. Bragg's waiver of his Miranda rights were knowing, voluntary, and intelligent. The agents exerted improper influence over Mr. Bragg, in violation of Hutto, by making up a story that they needed him to answer their questions because a woman's life may be in danger. And, the agents exerted improper influence over Mr. Bragg by interrogating him in the middle of his meeting with his parole agent, and exploiting the fact that Mr. Bragg could face prison time for disobeying his parole agent's instructions.

2.        This Court Should Hold An Evidentiary Hearing.

This Court should conduct an evidentiary hearing to determine whether Mr. Bragg's statements should be admitted into evidence. Under 18 U.S.C. § 3501(a), this Court is required to determine, outside the presence of the jury, whether any statements made by Mr. Bragg are voluntary. In addition, 18 U.S.C. §3501(b) requires this Court to consider various enumerated factors, including Mr. Bragg's understanding of his rights and of the charges against him.

Additionally, § 3501(a) requires this Court to make a factual determination. If a factual determination is required, courts must make factual findings by Fed. R. Crim. P. 12. See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990). Since "'suppression hearings are often as important as the trial itself,'" id. at 609-10 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in the government's pleading.

### III.
### MOTION TO SUPPRESS THE ILLEGAL CELL PHONE SEARCH AND ALL THE FRUITS OF THAT SEARCH

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. Amend. IV. A warrantless search is "per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (citations omitted). The government bears the burden of establishing that a warrantless search was reasonable, i.e., that it falls within an exception and was conducted reasonably, and did not violate the Fourth Amendment. United States v. Carbajal, 956 F.2d 924, 930 (9th Cir. 1992) (citations omitted).

### A)    The Search Was Not Valid Under The Search-Incident-To-Arrest Exception To The Warrant Requirement.

The government may argue that the search of the data in the cell phone was lawful as a search incident to arrest. The search was not lawful under the search-incident-to-arrest exception to the warrant requirement because this exception does

not apply to searching the data held in cell phones, and even if it did the search of the cell phone data took place three and a half hours after Mr. Bragg was arrested -- which is too long of a delay for a the exception to apply.

1) As A Rule, The Search-Incident-To-Arrest Exception To The Warrant Requirement Should Not Apply To Cell Phones.

The search-incident-to-arrest exception allows law enforcement to conduct a warrantless search incident to a person's arrest in order to protect officers from weapons or other things that could be used against the officers by the arrested person, and to prevent the loss or destruction of evidence. See Arizona v. Gant, 556 U.S. 332, 338 (2009).  However, [i]f there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." Id. at 339.  Thus, the search-incident-to-arrest exception may apply to seizing a cell phone from an arrestee's possession so that an arrestee does not smash the phone or use it as a weapon, but it cannot justify searching the *contents* of a cell phone.  As a rule, the search-incident-to-arrest exception should not apply to a search of the contents of a cell phone.

2) Even If The Search-Incident-To-Arrest Exception To The Warrant Requirement Applied To Cell Phones, The Over Three Hour Delay Before This Search Makes This Search Not "Incident" To Mr. Bragg's Arrest.

According to Detective Hunter's report, he arrested Mr. Bragg just before 8:00 p.m. on May 6, 2010.  He conducted a Cellebrite forensics download on the cell phone about three and a half hours later.  The Cellebrite phone examination report states that the extraction state date/time was "05/06/10 23:30:40," and that it ended at "05/06/10 23:33:10."  Thus, the search was at about 11:30 pm, a little over three and a half hours after Mr. Bragg's arrest just before 8:00 pm.

To be "truly incidental to arrest," the search must be "'roughly contemporaneous with the arrest.'" United States v. Caseres, 533 F.3d 1064, 1073 (9th Cir. 2008) (quoting United States v. Smith, 389 F.3d 944, 951 (9th Cir. 2004) (per curiam)).  In Hudson, the Court explained that "[c]oncerning the temporal scope

1   of the search, we have held that a 'search incident to arrest' must be conducted 'at

2   "about the same time as the arrest."'" United States v. Hudson, 100 F.3d 1409, 1419

3   (9th Cir. 1996) (quoting United States v. Turner, 926 F.2d 883 (9th Cir. 1991), and

4   United States v. Andersson, 813 F.2d 1450, 1456 (9th Cir. 1987)).

5       A delay of three and a half hours is not "roughly contemporaneous to arrest."

6   Courts, including the United States Supreme Court and Ninth Circuit, have declined

7   to apply this exception in cases where shorter periods of time elapsed from arrest to

8   warrantless search.  See e.g., United States v. Chadwick, 433 U.S. 1, 15-16 (1977)

9   (overruled on other grounds, California v. Acevedo, 500 U.S. 565 (1991)) (holding

10  that 1 hour delay between arrest and search of already seized footlocker too long to

11  be incident to arrest); United States v. Vasey, 834 F.2d 782, 787 (9th Cir. 1987)

12  (holding that 30 to 45 minute delay between arrest and search too long to be incident

13  to arrest, despite defendant still being present at arrest scene); United States v.

14  Gibson, No. 11-00734, 2012 WL 1123146, *10 (N.D.Cal. April 3, 2012) (holding that

15  a 1 to 2 hour delay between arrest and search of a cell phone was too long to be

16  incident to arrest).

17      The search here did not occur "contemporaneously with the arrest," Vasey, 834

18  F.2d at 786, and the Court should not "transform the search incident to arrest

19  exception into a search *following* arrest exception." Id. at 788 (emphasis in original).

20  Even if the Court finds that the search-incident-to-arrest exception can apply to a

21  search of the data in a cell phone, this search was too delayed to qualify under this

22  exception.

23  **B)   The Search Was Not Valid Under The Exception To The Warrant Requirement For California Parolees.**

24      The government may argue that the search of the cell phone was lawful under

25  the exception to the warrant requirement that applies to some California parolees.

26  This exception, often inaccurately called a "fourth waiver," is often included in the

27  conditions of release given to parolees when they are released from prison, and states

28  that "you and your residence and any property under your control may be searched

1   without a warrant by an agent of the Department of Corrections or any law

2   enforcement officer."  See Cal. Penal Code § 3067(a).  Like all exceptions to the

3   warrant requirement, the government bears the burden of establishing that such a

4   condition applied to Mr. Bragg.  See United States v. Caseres, 533 F.3d 1064 (9th

5   Cir. 2008).  However, even if the government is able to establish that Mr. Bragg was

6   properly subject to this condition, the search of the cell phone in this case exceeded

7   the permissible scope of the exception and was invalid.

8       The Supreme Court addressed, and upheld, this exception to the warrant

9   requirement in three important cases: Griffin v. Wisconsin, 483 U.S. 868 (1987);

10   United States v. Knights, 534 U.S. 112 (2001); and Samson v. California, 547 U.S.

11   843 (2006).  Both Griffin and Knights dealt with people on state probation, and

12   Samson dealt with a person on parole.  They held that probationers and parolees have

13   diminished expectations of privacy than a person not under supervision, because they

14   are on a "continuum of state-imposed punishments."  See Samson, 547 U.S. at 850

15   (internal citations omitted).  However, "restrictions on a parolee's liberty are not

16   unqualified.  Id. at 850 fn 1.  And, the law does not "equate parolees with prisoners

17   for the purpose of concluding that parolees, like prisoners, have no Fourth

18   Amendment rights."  Samson, 547 US. at 850 fn 2.  See also Griffin, 483 U.S. at 875

19   (holding that supervision is a special need of the state that "permit[s] a degree of

20   infringement upon privacy that would not be constitutional if applied to the public at

21   large.  *That permissible degree is not unlimited, however[.]*") (emphasis added).

22   Thus, although the Supreme Court has upheld certain warrantless searches pursuant

23   to conditions of parole or probation, the Court also made clear that these kinds of

24   conditions do not *eliminate* Fourth Amendment protection.

25       In each of these cases, the Supreme Court considered a warrantless search

26   regarding a probationer or parolee under the standard reasonableness analysis, which

27   applies a totality of the circumstances approach to the determine whether a search is

28   reasonable under the Fourth Amendment.  See Samson, 547 U.S at 848.  "Whether

1  a search is reasonable is determined by assessing, on the one hand, the degree to

2  which it intrudes upon an individual's privacy and, on the other, the degree to which

3  it is needed for the promotion of legitimate governmental interests." Id. (internal

4  citations omitted).

5       Applying this test, in each case the Court found the warrantless searches

6  reasonable under the Fourth Amendment on the basis of the state's substantial interest

7  in closely supervising people on probation or parole.  In Knights, the Supreme Court

8  found that a warrantless search condition of probation served two substantial state

9  interests -- rehabilitation of the probationer, and protecting society from future

10  criminal violations.  Knights, 534 U.S. at 119.  Similarly, Griffin found that the need

11  to closely supervise probationers and parolees was a special need, explaining that the

12  courts have "permitted exceptions [to the warrant requirement] when special needs,

13  beyond the normal need for law enforcement, make the warrant and probable-cause

14  requirement impracticable." Griffin, 483 U.S. at 873.  The special need of closely

15  monitoring probationers was to "assure that the probation serves as a period of

16  genuine rehabilitation and that the community is not harmed by the probationer's

17  being at large." Id. at 875.

18       Each case noted that imposing a warrant requirement would undermine the

19  state's substantial interest in closely monitoring probationers and parolees.  In Griffin,

20  the Court noted that:

21       A warrant requirement would interfere to an appreciable degree with the
         probation system, setting up a magistrate rather than the probation officer
22       as the judge of how close a supervision the probationer requires.
         Moreover, the delay inherent in obtaining a warrant would make it more
23       difficult for probation officials to respond quickly to evidence of
         misconduct, and would reduce the deterrent effect that the possibility of
24       expeditious searches would otherwise create[.]

25  Griffin, 483 U.S. at 876 (internal citations omitted).  In Knight, the Court concluded

26  that "'the very assumption of the institution of probation' is that the probationer 'is

27  more likely that the ordinary citizen to violate the law.'" Knights, 534 U.S. at 120,

28  citing to Griffin, 483 U.S. at 880.  From there, it held that

1  probations have even more of an incentive to conceal their criminal
2  activities and quickly dispose of incriminating evidence than the ordinary
   criminal because probationers are aware that they may be subject to
3  supervision and face revocation of probation, and possible incarceration,
   in proceedings in which the trial rights of a jury and proof beyond a
   reasonable doubt, among other things, do not apply.

4  Knights, 534 U.S. at 120.  In Samson, the Court noted that requiring reasonable

5  suspicion to conduct warrantless searches of parolees would "undermine the State's

6  ability to effectively supervise parolees and protect the public from criminal acts by

7  reoffenders," particularly because the state of California has such high numbers of

8  parolees and has a high recidivism rate.  Samson, 547 U.S. at 854.

9  Griffin, Knights, and Samson dealt with searches that were conducted by a law

10  enforcement officer to determine whether the person was in compliance with their

11  conditions of supervision -- including not violating the law.  None of the cases dealt

12  with a search that was conducted *after* the probationer or parolee was arrested and

13  back in custody.

14  Here, the cell phone was searched about three and a half hours after Mr. Bragg

15  was arrested and taken into custody for violating his conditions of parole.  The state's

16  substantial interest in closely monitoring Mr. Bragg's compliance with parole and

17  supervising him ended when he was arrested and taken into custody for violating

18  parole.  The search of the data on the cell phone cannot be justified as a "special

19  need" that excuses the failure to obtain a warrant, because once Mr. Bragg was in

20  custody, any special need to monitor his compliance with parole had ended, and the

21  only purpose of the search was to collect evidence.  Once he was in custody, the

22  search of the cell phone was squarely within the "normal need for law enforcement"

23  that is not enough to justify a special needs exception under Griffin.  483 U.S. 873.

24  The investigation and prevention of crimes is not a special governmental interest that

25  can excuse the warrant requirement.  See United States v. Scott, 450 F.3d 863, 870

26  (9th Cir. 2006) ("Crime prevention is a quintessential general law enforcement

27  purpose and therefore is the exact opposite of a special need.")

28  "The touchstone of the Fourth Amendment is reasonableness."  Samson,547

U.S. at 855 fn 4.   This Court must determine whether there was a substantial governmental interest in conducting a warrantless search that outweighs the privacy interests in the data in a cell phone.   See id. at 848.   Here, there was no substantial governmental interest that would have been harmed by obtaining a warrant before searching the cell phone in this case.   The factors that made the warrantless searches reasonable in Griffin, Knights, and Samson do not apply here because at the time of the search Mr. Bragg was already in custody and the phone was in the exclusive control of the state.   Mr. Bragg was not "at large" to harm the community as was a concern in Griffin.   483 U.S. at 875.   There was no longer a concern with the deterrent effect of an expeditious search, as was another concern in Griffin.   Id. at 876.   There could not have been concern that Mr. Bragg had a heightened incentive to destroy evidence, as was a concern in Knights, because the cell phone was already in the exclusive control of the detective when it was searched.   534 U.S. at 120.

On the other side, privacy interests in a cell phone are great.   The capabilities of cellular telephones today make them readily analogizable to a computer.   The Ninth Circuit has held a defendant has a legitimate, objectively reasonable expectation of privacy in a personal computer.   United States v. Heckenkamp, 482 F.3d 1142, 1146 (9th Cir. 2007); see also United States v. Ziegler, 474 F.3d 1184, 1189-90 (9th Cir. 2007) (holding that an employee had a reasonable expectation of privacy in a computer in a locked office despite a company policy that computer usage would be monitored).   Government-based publications acknowledge this similarity.   "Smartphones, or mobile phones with advanced capabilities like those of personal computers (PCs), are appearing in more people's pockets, purses, and briefcase." Paul Riggiero & Jon Foote, United States Computer Emergency Readiness Team, U.S. Dep't of Homeland Security, Cyber Threats to Mobile Phones, available at http://www.us-cert.gov/reading_room/cyber_threats_to_mobile_phones.pdf (last visited January 17, 2012).

A district court in the Northern District of California recently encountered an

almost-identical situation.  <u>United States v. Gibson</u>, 2012 WL 1123146 (N.D. Cal. Apr. 3, 2012).  There, the defendant was subject to a similar search condition while on probation in California, and law enforcement conducted a warrantless search of his house pursuant to that condition, which led to the finding of a gun and thus probable cause that the defendant was a felon in possession of a firearm.  The defendant was arrested, and about 1-2 hours later law enforcement searched his phone.  The court suppressed the search of the cell phone for violating the Fourth Amendment.

In this case, weighing the lack of any substantial governmental interest in searching the phone without a warrant against the substantial privacy interests in the data in a cell phone leads to only one conclusion: the warrantless search of the cell phone, where the cell phone was in the exclusive control of the state, and where Mr. Bragg was already in custody and no longer being supervised on the street, was unreasonable.

**IV.**
**MOTION TO DISMISS COUNT ONE OF THE INDICTMENT BECAUSE THE STATUTE AND MANNER UNDER WHICH MR. BRAGG IS CHARGED DOES NOT GIVE ADEQUATE NOTICE TO A PERSON SIMILARLY SITUATED TO MR. BRAGG THAT HE IS IN VIOLATION OF A CRIMINAL STATUTE AND THUS IS UNCONSTITUTIONAL**

The central question to be answered when determining whether 18 U.S.C. § 1591(a) and (b) is unconstitutional as applied to Mr. Bragg  is whether the statute and circumstances of how the statute is applied provides sufficient notice to make Mr. Bragg aware that he was engaged in criminal behavior. <u>United States v. Purdy</u>, 264 F.3d 809, 811 (9th Cir. 2001)(the resolution of this void-for-vagueness challenge turns on whether the language of [a statute] puts a defendant on notice that his conduct was criminal.).  A criminal statute must be sufficiently clear to allow an ordinary person to understand its meaning. <u>Broadrick v. Oklahoma</u>, 413 U.S. 601, 607 (1973). A criminal statute violates the Due Process Clause and is void for vagueness if it "fails to give persons of ordinary intelligence fair notice that their contemplated conduct is proscribed." <u>Fantasy Book Shop, Inc. v. City of Boston</u>, 652

F.2d 1115, 1122-23 n. 9 (1st Cir. 1981); <u>Marty's Adult World v. Town of Enfield</u>, 20 F. 3d. 512, 516 (2nd Cir., 1994); <u>United States v. Ocegueda</u>, 564 F. 2d 1363, 1365 (9th Cir. 1977).

The doctrine of vagueness clearly exists to defend due process interests. Where a law as applied to an individual is vague, it impermissibly delegates basic policy matters to policemen, juries, and judges for resolution on a subjective basis. Such a basis brings with it the danger or arbitrary and discriminatory application. <u>See</u> <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 108-109 (1972). When the law is vague, as it is as applied here, it does not give a person sufficient notice or description to allow a person to bring his actions into compliance with the law, nor does it allow a jury or a court to determine who is fairly in violation of the law and who is not.  It has long been the Supreme Court practice, however, before striking a federal statute as impermissibly vague, to consider whether the prescription is amenable to a limiting construction. <u>See</u> <u>Skilling v. U.S.</u>, 130 S.Ct. 2896 (2010); <u>Hooper v. California</u>, 155 U.S. 648, 657 (1895) ("The elementary rule is that *every reasonable construction* must be resorted to, in order to save a statute from unconstitutionality.") (emphasis added). <u>See also</u> <u>Boos v. Barry</u>, 485 U.S. 312, 330-331 (1988); <u>Schneider v. Smith</u>, 390 U.S. 17, 26(1968).  The Supreme Court has accordingly instructed "the federal courts ... to avoid constitutional difficulties by [adopting a limiting interpretation] if such a construction is fairly possible."  <u>Boos</u>, 485 U.S., at 331, 108 S.Ct. 1157; <u>see</u> <u>United States v. Harriss</u>, 347 U.S. 612, 618, 74 S.Ct. 808, 98 L.Ed. 989 (1954) ("[I]f the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague .... And if this general class of offenses can be made constitutionally definite by a reasonable construction of the statute, this Court is under a duty to give the statute that construction.").  Here, this court must strike any application of 1591(c) as unconstitutionally vague as to save the constitutionality of 1591 in general.

Section 1591(a) states whoever knowingly:

(1) in or affecting interstate or foreign commerce []recruits, entices, harbors, transports, provides, obtains, or maintains by any means a person; or

(2) benefits financially or by receiving anything of value, from participation in a venture which as engaged in an act described in violation of paragraph (1), knowing, or in reckless disregard of the fact, that means of force, threats of force, fraud, coercion [], or any combination of such means will be sued to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 year and will be caused to engage in a commercial sex act, shall be punished.

The government has charged Mr. Bragg with knowingly recruiting, enticing, harboring, transporting, providing, obtaining, and maintaining by any means Minor Female #1, knowing and in reckless disregard of the fact that Minor Female #1 would be caused to engage in a commercial sex act, having had a reasonable opportunity to observe Minor Female #1 and knowing and in reckless disregard of the fact that Minor Female #1 had not attained the age of 18 years.

Pursuant to § 1591 (a), the government has to prove that Mr. Bragg knew or was in reckless disregard of the fact that the Minor Female alleged in the indictment had not attained the age of 18 years. However, by adding the language "having had a reasonable opportunity to observe the Minor Female # 1," the government seems to be triggering another subsection of § 1591, although it has not specifically indicated so in the indictment. According to § 1591(c) "In a prosecution under subsection (a)(1) in which the defendant had a reasonable opportunity to observe the person so recruited, enticed, harbored, transported, provided, obtained or maintained, the **government need not prove that the defendant knew that the person had not attained the age of 18 years.**" (emphasis added). If by adding the language "reasonable opportunity to observe Minor Female," the government is attempting to include subsection (c) of 1591 to count one, then Mr. Bragg requests this court to strike that language from the indictment because "reasonable opportunity to observe" is undefined and unconstitutionally vague.

The inquiry turns on how a person of normal intelligence is supposed to interpret the term "reasonable opportunity to observe" and whether there is sufficient

1   notice or description to allow that person to bring his actions into compliance with

2   the law.  Grayned, 408 U.S. at 108-109.  There is a lack of guidance in the law about

3   how a possible defendant, law enforcement, or juror is to interpret "reasonable

4   opportunity to observe" in terms of length of exposure, type and intensity of

5   acquaintance, and what is the criterial level of curiosity or inquisitiveness.  The

6   phrase "reasonable opportunity to observe" is not defined by the statute, though other

7   terms in § 1591 are defined, including "coercion," "commercial sex act," "serious

8   harm," and "venture."  18 U.S.C. § 1591(e).  Likewise, there are no Circuit Court

9   cases that define "reasonable opportunity to observe."   By statute or judicial

10  limitation, the term has no restraints as far as what amount of time constitutes

11  "reasonable opportunity."  It could mean one day, one month, one year.  Furthermore,

12  the term does not specify whether "observe" means "observe" body parts of the

13  minor, "observe day to day actions" of the minor, "observe" conduct of a minor.

14  Without any definition, the term "reasonable opportunity to observe" is without limits

15  and unconstitutionally vague, and that language must be struck from the indictment.

## V.
## COUNT ONE AND 18 USC § 1591(c) IMPERMISSIBLY LESSENS THE GOVERNMENT'S BURDEN OF PROOF IN VIOLATION OF MR. BRAGG'S FIFTH AMENDMENT RIGHT TO DUE PROCESS

18          Pursuant to 18 U.S.C. § 1591(a), the government is required to prove, beyond

19  a reasonable doubt, that Mr. Bragg knew or was in reckless disregard of the fact that

20  the minor had not attained the age of 18 years.  However, § 1591(c) alleviates the

21  government's burden to prove that Mr. Bragg knew the person had not attained the

22  age of 18 years if Mr. Bragg had a "reasonable opportunity to observe" the person.

23  Accordingly, 1591(c), an undefined statute, impermissible lowers the burden of proof

24  for the government and eliminates an element of the offense under 1591(a).  As such,

25  1591(c) and count one of the indictment is in violation of Mr. Bragg's Fifth

26  Amendment right to due process.

27          This issue is often raised in the context of jury instructions.  However, the same

28  fatal constitutional flaws can occur within a statute if the government's burden is

1  unconstitutionally lowered as to an essential component of an offense. It is clearly

2  established federal law, as determined by the Supreme Court, that a defendant is

3  deprived of due process if a jury instruction "ha[s] the effect of relieving the

4  [government] of the burden of proof enunciated in Winship on the critical question

5  of a [defendant's] state of mind." Sandstrom v. Montana, 442 U.S. 510, 521 (1979);

6  Francis v. Franklin, 471 U.S. 307, 326 (1985) (reaffirming "the rule of Sandstrom and

7  the wellspring due process principle from which it was drawn."); see also In re

8  Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused

9  against conviction except upon proof beyond a reasonable doubt of every fact

10  necessary to constitute the crime with which he is charged.").

11  In Winship, the Supreme Court confronted the question of the quantum of

12  proof necessary for the conviction of a juvenile offender in juvenile court. The Court

13  observed that "[d]ue process commands that no man shall lose his liberty unless the

14  Government has borne the burden of [proof] .... It is critical that the moral force of

15  the criminal law not be diluted by a standard of proof that leaves people in doubt

16  whether innocent men are being condemned." 397 U.S. at 364 (citations omitted). The

17  Court then held, "Lest there [be] any doubt about the constitutional stature of the

18  reasonable-doubt standard, we explicitly hold that the due process clause protects the

19  accused against conviction except upon proof beyond a reasonable doubt of every fact

20  necessary to constitute the crime with which he is charged." Id.

21  Here, § 1591(c), which eliminates the government's burden to prove the

22  essential element of knowledge on behalf of Mr. Bragg, is in direct conflict with the

23  Supreme Court's holding in Winship. Without section 1591(c), the government is

24  required to prove that Mr. Bragg knew or was in reckless disregard of the fact that the

25  person named in the indictment has not attained the age of 18 years. The knowledge

26  element of an offense is one of the most important facts necessary to constitute a

27  crime in which a person is charged. As was made clear by the Supreme Court, "the

28  due process clause protects the accused against conviction except upon proof beyond

a reasonable doubt of every fact necessary to constitute the crime." <u>Id.</u>  Section 1591(c) violates Mr. Bragg's due process rights because it completely eliminates any requirement by the government to prove knowledge.   As such, count one of the indictment must be dismissed.

**VI.**

**THE PREJUDICE TO MR. BRAGG FROM JOINDER OF THE TWO COUNTS REQUIRES SEVERANCE IN THE INTEREST OF JUSTICE BECAUSE THE TWO COUNTS EACH HAVE THE SAME ELEMENT THAT HAS DIFFERENT BURDENS OF PROOF**

This Court should sever the trials for the two charges in the indictment because of the prejudice that Mr. Bragg would suffer if the offenses were tried together.  Rule 14 is captioned: "Relief from Prejudicial Joinder," and provides that "[i]f the joinder of offenses . . . in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts[.]"  Fed. R. Crim. P. 14(a).  Severance is warranted under Rule 14 when "'there is a serious risk that a joint trial would . . . prevent the jury from making a reliable judgment about guilt or innocence.'"  <u>United States v. Stinson</u>, 647 F.3d 1196, 1205 (9th Cir. 2011) (quoting <u>Zafiro v. United States</u>, 506 U.S. 534, 539 (1993)).

The problem with joinder in this case is that each count has a different burden of proof on the same element -- knowledge of the minor's age.  Proof of knowledge of the minor's age lies with the government under § 1591.  The government must prove that the defendant knew or acted in reckless disregard of the minor's age.  18 U.S.C. § 1591(a).  As discussed in section V of these motions, the statute also states that the government may prove in the alternative that the defendant had a "reasonable opportunity to observe" the minor.  18 U.S.C. § 1591(c).  Regardless of which burden of proof applies, the burden lies with the government under § 1591.

On the other hand, 18 U.S.C. § 2251 is silent about the knowledge requirement on the minor's age, and appear not to require knowledge.  However, the Courts have held that the First Amendment requires that there be an affirmative defense to the knowledge of the minor's age.  <u>See</u> <u>United States v. United States District Court</u>, 858

24

F.2d 534, 540-42 (9th Cir. 1988). The pattern jury instructions for § 2251 state that "[i]t is a defense to a charge of sexual exploitation of a child that the defendant did not know, and could not reasonably have learned, that the child was under 18 years of age. The defendant has the burden of proving by clear and convincing evidence [] that the defendant did not know and could not reasonably have learned that [*name of victim*] was under 18 years of age." Ninth Cir. Model Crim. Jury Inst. 8.186 <u>Sexual Exploitation of a Child -- Defense of Reasonable Belief of Age</u>, 2010.

It is too much to expect a jury to compartmentalize two different burdens of proof, on opposing parties, for the exact same element in one trial. The jury would be required to evaluate the same evidence twice, under completely different standards. For Count One the jury would have to evaluate the evidence about Mr. Bragg's knowledge to determine whether the government met its burden of proof with respect to that element. For Count Two, the jury would have to evaluate the same evidence, in consideration of the same element, but determine whether Mr. Bragg had met his burden. On top of that, the jury would have to evaluate whether Mr. Bragg met a lower burden of proof. There is great danger that when considering the same evidence on the same element, the jury would: lower the government's burden of proof to that of Mr. Bragg's burden of proof; heighten Mr. Bragg's burden of proof to that of the government's burden of proof; or make a finding on only one element of one count and apply that finding to the same element in the other count.

Even if a jury could be expected to rule on the same element with two different burdens of proof, there is prejudice to Mr. Bragg's ability to present a defense and his constitutional rights -- particularly his right to remain silent. Raising an affirmative defense essentially requires the defendant to put on evidence in a trial. Of course, when challenging whether the government has met their burden of proof a defendant is entitled to remain silent and not present any evidence. Trying the two counts together potentially means that Mr. Bragg may have to present evidence on that

element in order to establish his affirmative defense for Count Two, even if he would choose to remain silent and not present evidence on the same element for Count One. This problem is most pronounced in the context of Mr. Bragg's decision of whether or not to testify.

Because the government has the burden of proving (beyond a reasonable doubt) knowledge of the minor's age in one charge, and the defendant has the burden of showing (by clear and convincing evidence) a mistaken belief in the minor's age in the other charge, the counts must be severed for trial.

## VII.

## <u>THIS COURT SHOULD GRANT LEAVE TO FILE FURTHER MOTIONS</u>

Mr. Bragg requests leave to file further motions if they become necessary from new information.

## VIII.

## <u>CONCLUSION</u>

For the reasons stated, Mr. Bragg requests that this Court grant his motions.


Respectfully submitted,


DATED:    January 18, 2013              *s/ Bridget L. Kennedy*
                                        **BRIDGET L. KENNEDY**
                                        Federal Defenders of San Diego, Inc.
                                        Attorneys for Mr. Bragg